IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 28, 2010 Session

**IN RE: ADOPTION OF LOGAN A.S.**

**JOHN W. W., JR., STEPHANIE L. W.**, and **LINDSEY B. W.**
v.
**GLENN S.**

**Appeal from the Chancery Court of Shelby County**
**No. CH-02-1839-2    Arnold B. Goldin, Chancellor**

---

**No. W2009-02661-COA-R3-PT - Filed October 12, 2010**

---

This appeal involves the termination of parental rights. The child at issue was born to teenage parents who never married and have long-term, continuing problems with substance abuse. As a result of his substance abuse, the father has been in and out of prison for much of the child's life. The child has lived with the petitioners, the maternal grandfather and maternal step-grandmother, who filed a petition to terminate the parental rights of both parents and adopt the child. The mother subsequently joined in the petition. After a trial, the trial court terminated the father's parental rights, finding abandonment by, *inter alia*, engaging in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. The father now appeals. We affirm, finding that the undisputed evidence supports the trial court's finding on the ground of abandonment by wanton disregard, and that termination of the father's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Bradley C. Ball, Lakeland, Tennessee, for the Appellant, Glenn S.

Kevin W. Weaver and Lundy B. Carpenter, Memphis, Tennessee, for the Appellees, John W. W., Jr, Stephanie L. W., and Lindsey B. W.

Melinda Jewell, Memphis, Tennessee, Guardian ad Litem.

# OPINION

## FACTS AND PROCEEDINGS BELOW

The child at issue in this case, Logan A.S., was born in November 1998 in Memphis, Tennessee, to co-petitioner, Lindsey B. W. ("Mother") and Glenn S. ("Father"). At the time, Mother was seventeen years old and Father was nineteen years old. Mother and Father never married. Father and Mother used illegal drugs before Mother's pregnancy, and this continued after the birth of the child.

After the child was born, both the parents and the child lived for a brief period with Mother's maternal grandmother and then for a short time with Father's mother. In the summer of 1999, when the child was still an infant, the parents and the child lived with Petitioners/Appellees John W.W., Jr. ("Grandfather") and Stephanie L.W. ("Grandmother"), the child's maternal grandfather and step-grandmother (collectively "Grandparents"). Father obtained a job and the Grandparents facilitated the parents' move into an apartment, with the child.

Soon after the parents moved into their own apartment, in August 1999, Father was arrested for theft of property.[1] In approximately October 1999, Mother was hospitalized after she overdosed on drugs while at the apartment. When they learned of Mother's overdose, the Grandparents went to the parents' apartment to ensure that Logan was being adequately cared for by Father. Grandparents found Father either asleep or passed out on the sofa, evidently on drugs while the eleven month old child was left unattended on the floor in another room. Grandparents immediately took the child to their home that day, and Father did not object. From that time on, the child has continuously lived with Grandparents.

On October 20, 1999, the Shelby County Juvenile Court entered a consent order, signed by both Mother and Father, granting custody of Logan to the Grandparents. At the time, both parents recognized their substance abuse issues and agreed it was best for the child to live with the Grandparents. After that, Mother was incarcerated intermittently, and completed some half dozen stints in 30-day drug rehabilitation programs. After completing each rehabilitation program, Mother would live for a few weeks with the Grandparents and the child, until she recommenced her use of illegal drugs and left the Grandparents' home. If Father was not incarcerated during the times when Mother was living with the Grandparents, Mother would, without the Grandparents' knowledge, bring the child to see Father. These were the only contacts Father had with Logan during this time. When the Grandparents

---

[1]The item that Father stole belonged to Mother's mother, the maternal grandmother of Logan A.S.

learned that Mother took the child to see Father, they stopped the visits. Father did not contact the Grandparents to set up visits with the child, and did not send financial support for the child to the Grandparents. The Grandparents made it clear to Father that he would not be permitted to visit the child until he had been "clean" from illegal drugs for a significant period of time.

From the time that the Grandparents took custody of the child in October 1999 until the Grandparents filed the first petition for termination of parental rights, Father was in and out of jail on a variety of theft-related charges:

•January 2001: Father pled guilty to theft of property and vandalism, and received six months' incarceration;
•April 2001: Father pled guilty to burglary of a building and evading an arresting officer; for this he received a two year sentence;
•August 2001: Father pled guilty to theft, aggravated robbery, and evading arrest. For theft, he was sentenced to 44 days, with credit for time served. For the aggravated robbery and evading arrest offenses, he was sentenced to three years (suspended) sentence and one year (suspended) sentence, respectively, to run concurrently, and also to three years' probation and one year probation, respectively; and
•September 2002: Father was arrested by a federal park ranger for stealing a vehicle, he was sentenced to three years in federal prison in Mississippi, followed by three years of probation.

On September 23, 2002, the Grandparents filed a petition to terminate the parental rights of both Mother and Father, and to adopt Logan and change his last name to theirs. As grounds for termination, the petition asserted that both Mother and Father had abandoned Logan, as defined in Tennessee Code Annotated § 36-1-102. As to Father, the petition alleged that he had willfully failed to visit or failed to provide financial support for the child for the four month period preceding the filing of the petition. The petition also asserted that termination of the parental rights of both parents was in the best interest of the child. Father, incarcerated in Mississippi at the time the petition was filed, responded in October 2002 with a letter sent from the Mississippi prison stating that he did not wish to surrender his parental rights. The trial court then appointed an attorney on his behalf. The record reflects no further activity on the Grandparents' petition for almost two years. During this time, Father remained incarcerated in Mississippi.

On August 25, 2004, Grandparents filed an amended petition for adoption and termination of parental rights. The amended petition included Mother as a co-petitioner, because Mother consented to the termination of her parental rights and to the Grandparents' adoption of Logan.

The amended petition also amended the grounds for termination asserted against Father. As Father remained incarcerated in Mississippi, the amended petition asserted that he had abandoned the child by willfully failing to visit and willfully failing to provide financial support during the four-month period preceding his incarceration, citing T.C.A. § 36-1-102(1)(A)(iv). It also asserted that Father engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the child, under the same statutory provision. In December 2004, the trial court appointed a guardian ad litem for the child. In May 2005, a new attorney was substituted as counsel for Father. The record reflects no further activity for over two years.

In the meantime, however, on May 4, 2005, while Father remained incarcerated in Mississippi, his probation for the crimes for which he pled guilty in August 2001 was revoked. Consequently, when he was released from the Mississippi prison in March 2005, he was transferred directly to Shelby County, where he remained incarcerated until July 14, 2006.

After Father was released from incarceration, in September 2006, he sent two fifty-dollar checks to the Grandparents' attorney, for the support of Logan. The Grandparents apparently did not accept the proffered support. At some point, Father drove by the Grandparents' home and saw Logan outside at the driveway playing basketball. Father pulled into the driveway, spoke briefly to Logan, and gave the child a teddy bear. He then immediately left. Not long after that, in October 2006, Father committed another theft. He was arrested later that month, and remained incarcerated until February 2007.[2]

After that, Father committed additional theft-related offenses and his probation from another earlier offense was revoked. He was incarcerated again in November 2007, and remained incarcerated through the trial on the Grandparents' petition.[3]

---

[2] In November 2006, while incarcerated, Father pled guilty to other prior charges, but apparently received no additional jail time.

[3] In December 2007, Father filed a motion to dismiss Grandparents' and Mother's petition for adoption and termination of parental rights for lack of prosecution. The motion was not acted on prior to the trial.

The trial was held on September 16, 2009. The trial court heard testimony from the Grandparents and from Father.[4]

Grandfather testified at the outset of the trial. He described how he and Grandmother came to have custody of Logan, and his dealings with Father. Grandfather explained that they filed the amended petition for termination and adoption, adding Mother as a co-petitioner, after Mother finally agreed to surrender her parental rights. At the time of trial, Mother was in Mississippi, incarcerated for theft offenses. Grandfather said that after he and Grandmother took custody of Logan, Mother was permitted to see the child only when she had completed one of her in-patient drug rehabilitation programs, and was clean of any illegal substances while living with the Grandparents. These drug-free periods would last for only a few weeks. Grandfather said that, since he and Grandmother took custody of Logan, his position with Father was the same as his position with Mother, that is, for Father to visit with Logan, he "had to be off drugs completely." Grandfather explained that when he learned that Mother was surreptitiously taking the child to see Father, he stopped the visits because Mother admitted to Grandfather that Father was abusing drugs at the time of the visits.

Grandfather testified that he, Grandmother, and Logan live in a rural setting, a house on five acres with a pond. It is the only home the child has known. He and Grandmother are both employed, with full insurance benefits. Grandfather's work allows him to be home to meet the child when he comes home on the school bus, and also to be available to coach the child's sports teams. He and Grandmother filed the petition to adopt Logan because "he needs to know that that's his home and it's always going to be there and nobody can mess it up."

Grandmother testified as well. She said that the two fifty-dollar checks Father sent to their attorney were the only financial support for the child that Father had ever offered. She said that she and Grandfather have raised Logan as their own child, and that they have both been very involved in all of the child's school and extracurricular activities. She commented that Grandfather and the child are particularly close, like "two peas in a pod."

Grandmother testified that they had received several letters Father had written to the child, some written from jail. She said that they showed the child the letters once he become old enough to read them. Grandmother acknowledged that she and Grandfather never made any effort to involve Father or Father's family in the child's life.

The trial court then heard testimony from Father. Father emphasized that he believed that the Grandparents had "done a great job" with respect to Logan, and that he did not want the child removed from their custody. However, once he and Mother agreed to grant custody of

---

[4]The trial court also heard testimony from Father's mother and from the guardian ad litem.

Logan to the Grandparents, Father claimed, he had not been permitted to see the child. He said that the Grandparents even changed their telephone number. Although he knew where the Grandparents lived, Father said, Grandfather had made it clear that he could not visit the child until he had been off illegal drugs for a period of time. Father said: "I knew if I did go over there he was going to call the police on me, true enough. I'm on drugs, I don't want to be around the cops, you know."

Father testified that he wrote letters to the child at least three times a year. Although he did not pay child support, Father said, he would buy clothes for the child and give them to Mother. He explained that, even though he was not seeking custody of the child, he wanted to build a relationship with his son. Father also wanted the child to retain his last name, rather than change his last name to that of the Grandparents.

Father conceded he had a continuing addiction to heroin. He also acknowledged his "extensive record" of convictions on theft-related offenses and the resulting numerous periods of incarceration. Father agreed with his attorney's description that his "history is one of drug use leads to theft leads to prison."

During cross-examination, Father expressed frustration at the numerous questions about his criminal record and periods of incarceration. He said his focus was on the future of his son. He said he never received counseling or assistance. However, Father said that he was motivated to get his "life back on track." Father testified about his plan to do so after his release from prison:

> I'm going to live with my mom, but eventually – you know, my mom is going to help me get on my feet, and my girlfriend, she's going to help me get on my feet, you know. I'm just going to take it day-by-day and go from there. I'm going to get a job and work. I'm not scared of work, you know, I'm 30 years old, you know, and this jail and drugs is getting very old. My son is getting old, my mama is getting old and, you know, I just can't keep living like this.

Father stated a willingness to attend counseling to deal with his addiction issues.

At the conclusion of the testimony, the trial court issued an oral ruling. The trial court found clear and convincing evidence of grounds for termination under T.C.A. § 36-1-101(1)(a)(iv) for failure to pay support for the four-month period prior to incarceration, and for actions prior to incarceration that exhibited a wanton disregard for the welfare of the child. The trial court declined to find willful failure to visit prior to incarceration. The trial court also concluded that it was in the child's best interest to terminate Father's parental rights, and permit the Grandparents to adopt. The trial judge expressed hope that Father would in fact

"turn his life around," and then perhaps be able to have a relationship with his son, even though the legal relationship would be terminated.

On November 12, 2009, the trial court entered an order to the same effect, finding that Father had abandoned the child under T.C.A. § 36-1-102(1)(A)(iv) by willful failure to support Logan during the four month period prior to his incarceration, and by engaging in conduct prior to his incarceration that exhibited a wanton disregard for the child's welfare. The trial court noted that Father had not maintained a meaningful relationship with the child, and would be unable to provide a healthy and safe physical environment for the child because Father remained incarcerated. Furthermore, the trial court found clear and convincing evidence that termination of Father's parental rights was in the best interest of the child. Accordingly, the trial court terminated the parental rights of both Mother and Father, placed the child in the complete, custody, control, and guardianship of the Grandparents, and authorized the Grandparents to proceed with adoption.

On December 14, 2009, Father filed a notice of appeal.[5]

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father raises two issues. He argues first that the trial court erred in finding clear and convincing evidence that Father abandoned the child. Secondly, he contends that the trial court erred in finding that termination of Father's parental rights is in the best interest of the child. Consequently, he maintains his parental rights should not be terminated. On cross-appeal, the Grandparents assert that the trial court erred by not finding that Father willfully failed to visit the child during the four month period prior to his incarceration.

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its

---

[5]In February 2010, the trial court entered an order amending the order on termination of parental rights to include the denial of Father's motion to dismiss for lack of prosecution. Father's notice of appeal, filed prior to the trial court's February 2010 amended final order, is deemed timely filed under Rule 4(d) of the Tennessee Rules of Appellate Procedure. *See* T.R.A.P. 4(d).

limitation or termination. ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002); ***In re M.J.B.***, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Termination proceedings are governed by statute in Tennessee. ***In re J.C.D.***, 254 S.W.3d 432, 438 (Tenn Ct. App. 2007). A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. TENN. CODE ANN. § 36-1-113(c)(1) (2010). If grounds for termination are established, the party seeking termination must then prove that termination of the parental rights of the biological parent is in the child's best interest. TENN. CODE ANN. § 36-1-113(c)(2) (2010).

Because of the profound consequences of a decision to terminate parental rights, courts apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. TENN. CODE ANN. § 36-1-113(c) (2010); ***In re Adoption of A.M.H.***, 215 S.W.3d at 808; ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. ***See In re M.W.A., Jr.,*** 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt from the evidence." ***In re Audrey S***., 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.*** (citations omitted); ***see also In re A.D.A.***, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." ***In re Tiffany B.***, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's determinations as to the credibility of the witnesses. ***Seals v. England/Corsair Upholstery Mfg. Co.***, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. TENN. R. APP. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). The appellate court then determines whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establishes all of the elements required to terminate the biological parent's parental rights. ***In re Tiffany B.,*** 228 S.W.3d at 156; ***In re S.M.,*** 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law are reviewed *de novo* on the record, affording them no presumption of correctness. ***In re Tiffany B.***, 228 S.W.3d at 156; ***Campbell v.***

*Florida Steel Corp*., 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## ANALYSIS

### Grounds for Termination

On appeal, Father argues that the trial court erred in finding clear and convincing evidence that he abandoned the child, within the meaning of T.C.A. § 36-1-102(1)(A)(iv). He notes that, prior to his incarceration, he visited with the child "frequently" when Mother brought the child to see him. On those visits, he notes, the evidence shows that Father purchased clothing for the child. At a later time between periods of incarceration, Father sent checks for child support. Father maintains that the evidence shows that the Grandparents prevented visits, made no effort to communicate with him, and overall thwarted efforts by Father and by Father's family to maintain a relationship with the child.

In this case, the grounds for termination of Father's parental rights were abandonment. The Grandparents' original petition for termination asserted grounds for termination under T.C.A. § 36-1-102, claiming that Father willfully failed to visit and willfully failed to support the child during the four-month period prior to the filing of the petition. However, in light of Father's continued incarceration, the amended petition cited abandonment under T.C.A. § 36-1-1092(1)(A)(iv) as grounds for termination. The case was tried based on Section 36-1-102(1)(A)(iv), and the trial court's findings were based on this statute, so we proceed on appeal under this statute as well.

> T.C.A. § 36-1-102(1)(A)(iv) defines the term "abandonment" as follows:
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

TENN. CODE ANN. § 36-1-102(1)(A)(iv) (2009 Supp.). Here, the trial court found abandonment by willful failure to support, and by conduct that exhibits a wanton disregard for the welfare of the child. We consider first the grounds based on a wanton disregard for the welfare of the child.

We have held that, under this statute, the pre-incarceration conduct "that exhibits a wanton disregard for the welfare of the child" need not occur during the four-month period immediately preceding the parent's incarceration, in order to serve as the basis for the trial court's finding of abandonment. *See In the Matter of K.H.*, No. W2008-01144-CoA-R3-Pt, 2009 WL 1362314, at *13 (Tenn. Ct. App. May 15, 2009) (citing *In re: Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005)).

Moreover, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, [and] substance abuse . . . can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. Stated differently, this Court has emphasized that "an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate [himself] by continuing to abuse drugs, resulting in revocation of [his] parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005), *perm. app. den*. (Tenn. Mar. 21, 2005).

In this case, it is undisputed that Father's multiple incarcerations for drug-related thefts have kept him incarcerated for nearly all but a few months of the child's life. By his own admission, his record is "extensive." Indeed, it can fairly be said that Father "has lived a life of crime, fueled by his drug addiction, for most of [Logan's] life." *In re: H.A.L.*, M2005-0045-COA-R3-PT, 2005 WL 954866, at *1 (Tenn. Ct. App. Apr. 25, 2005).

At trial, and in this appeal, there is little that Father can say about this ground for termination of his parental rights. The facts are what they are. At trial, Father's primary response to the discouraging quantum of evidence on his many convictions, probation revocations, and incarcerations was to protest that the focus should be on the child's future and to outline his plan for reforming his life upon release from prison.

Father's plan for rehabilitation is to be commended. However, in determining whether grounds for termination of the parental rights of a biological parent are established, both the trial court and this Court must look to the evidence of the parent's past actions, rather than the parent's future aspirations. Without question, the evidence in this record establishes by clear and convincing evidence that Father abandoned Logan by engaging in "conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child" under Section 36-1-102(1)(A)(iv). The trial court's finding on this ground is affirmed.

"[O]nly one ground [for termination of parental rights] need be proved, so long as that ground is proved by clear and convincing evidence." *R.G.W. v. S.M.*, No. M2009-001153-COA-R3-PT, 2009 WL 4801686 at *1 (Tenn. Ct. App. Dec. 14, 2009) (citing *In re D.L.B.*,

118 S.W.3d 360, 367 (Tenn. 2003)). Therefore, we decline to address the remaining issues raised on appeal by both parties as to abandonment by willful failure to support and by willful failure to visit.

## Best Interest

To terminate the parental rights of a biological parent, the trial court must also find by clear and convincing evidence that termination is in the best interest of the child. TENN. CODE ANN. § 36-1-113(c) (2009 Supp.). T.C.A. § 36-1-113(i)[6] sets forth the factors considered in

---

[6]The statute provides as follows:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(continued...)

determining whether termination is in the best interest of the child; however, this list is not exhaustive. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 WL 970434, at *7 (Tenn. Ct. App. May 10, 2002)). "The child's best interests must be viewed from the child's, rather than the parent's perspective." *In re Marr,* 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).

In this appeal, Father emphasizes that he does not seek custody of the child. Therefore, he argues that the best interest factors relating to a change in custody, caretaker or environment are not applicable. He argues that his efforts to maintain a relationship with the child were obstructed by the Grandparents. Father acknowledges that "he has not been able to overcome his addiction to drugs," and as a consequence, much of his time has been spent "in jail." However, Father notes that he has obtained his G.E.D., and "has a plan for obtaining stability upon his release from prison."

In this case, the record contains ample evidence that termination of Father's parental rights is in the child's best interest. It is essentially undisputed that Father has no meaningful relationship with Logan. Father attributes this to the Grandparents' continual frustration of his efforts to maintain a relationship with his son. The record does not bear out this assertion. Father acknowledged that the Grandparents' consistent position has been that Father was not permitted to visit with the child unless he was out of prison and free of substance abuse for a reasonable period of time. Father also acknowledges that he has been unable to meet this minimal requirement. Instead, he amassed numerous convictions for theft-related offenses, fueled by his unchecked substance abuse. Father's lack of a meaningful relationship with his son can only be attributed to his own choices.

In contrast, the Grandparents have provided Logan with an idyllic childhood environment. The child has a sustained and solid relationship with the Grandparents in the only home he has ever known. The Grandparents have provided for the child financially, and have given him a loving, supportive home environment. The termination of Father's parental rights paves the way for Grandparents to adopt Logan, and provide him the permanency and stability in environment that is the goal for children under Tennessee statutes. From our review of the record, we affirm the trial court's finding that termination of Father's parental rights is in the child's best interest.

---

[6] (...continued)

> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

TENN. CODE ANN. § 36-5-101 (2009 Supp.).

**CONCLUSION**

The decision of the trial court is affirmed.  Costs on appeal are to be taxed to the Appellant, Glen S., and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE